*In re* WARD'S ESTATE.

1. JUDGMENT—RES JUDICATA—VOLUNTARY DISMISSAL—PRESUMPTIONS.
     In the absence of evidence to the contrary, it will be presumed that a voluntary dismissal of a suit on the hearing was on the merits.

2. SAME—DISMISSAL AS BAR.
     To operate as a bar to a subsequent suit, the dismissal of a suit must have been on the merits, or, if voluntary, after proofs taken and the cause in readiness for hearing.

3. DISMISSAL AND NONSUIT—VOLUNTARY DISMISSAL—EFFECT.
     Complainant filed a bill against the executors of an estate of which he was a beneficiary, to enjoin certain expenditures in their management of the estate, and an interlocutory injunction was issued, and afterward modified by a consent order, limiting the amount defendants were permitted to expend, and thereafter complainant took an appeal from the first and third annual accounts filed by the executors, and, the chancery suit and the appeals coming to trial, the question arose as to whether the chancery suit or the probate appeals should be heard first, and the parties agreed that either suit would decide the controverted questions, and that the bill should be dismissed.  *Held*, that the dismissal was not on the merits.

4. SAME—CONSENT OF PARTIES—NECESSITY.

The chancery suit could only be dismissed by the consent of the parties, since by the consent order defendants had acquired rights of which they could not be deprived without their consent.

5. SAME—VOLUNTARY DISMISSAL—EFFECT.

By consenting to the dismissal of the bill, the parties surrendered the respective rights they had acquired under the interlocutory decree, and under the injunction orders, and all the incidents of the bill fell with it; the position of the parties being the same as if the suit had never been instituted.

6. SAME.

The bill having been dismissed, the injunction and interlocutory orders based thereon fell with it, and it was error to try the probate appeals upon the theory that the amount of expenditures allowed by the injunction was conclusive of that question on the probate appeals, since the decree dismissing the bill deprived the court of the power of punishing as for contempt any acts violative of the injunction orders, and hence. such acts could not be held unlawful in an entirely distinct suit in another court.

7. ESTOPPEL—EQUITABLE ESTOPPEL—GROUNDS—ACQUIESCENCE—ASSENT TO JUDICIAL PROCEEDINGS.

Where complainant procured an order enjoining defendants, as executors of an estate, from expending more than a certain sum in erecting a mill to saw lumber of the estate, and later consented to the modification of the injunction by permitting defendants to expend a further sum, such modification not having been secured by fraud, complainant's consent thereto is conclusive evidence of his acquiescence in the expenditure of the agreed sum, notwithstanding the injunction bill was subsequently dismissed by mutual consent of the parties.

8. APPEAL AND ERROR—REVIEW—FINDINGS OF COURT—CONCLUSIVENESS—PRESUMPTIONS.

Where the certificate of the circuit judge states that the bill of exceptions contains all the testimony introduced and proceedings had upon trial, it will not be presumed that the findings of the court state the facts correctly, if the record negatives such presumption.

9. APPEAL AND ERROR — PROBATE APPEALS — GROUNDS OF APPEAL—NECESSITY OF STATING—REVIEW—EXTENT.

The statute regulating appeals from the probate court (sections 669, 671, 673, 679, 1 Comp. Laws) requires the appellant

to state the reasons for his appeal, and the appellate court is limited to the determination of the questions so presented.

10. EXECUTORS AND ADMINISTRATORS—ACCOUNTING—REVIEW.

Where the balance found on the first annual account filed by executors was appealed from, it was not necessary or proper to appeal from this same balance again on the second annual account, since the second annual account involved only the new items not included in the first account, and the adjudication thereon only affected such items.

11. SAME—EFFECT—CONCLUSIVENESS.

The order allowing the second annual account of executors was conclusive as to the additional items included therein, in the absence of fraud or mistake, in which event, however, the finding could be challenged upon a subsequent accounting.

12. SAME—CHARGES.

Executors may properly charge an item to either of two accounts, where they might lawfully determine in the first instance to make the expenditure out of either of the accounts, and where executors in the administration of an estate erected a sawmill, and, to facilitate its operation, organized a railroad corporation and constructed a logging railroad thereto, items expended for constructing switches, mill tracks and docks were properly charged to the railroad account.

13. SAME—SETTLEMENT—APPEAL—METHOD OF HEARING.

Though it is proper on appeal from the probate court to hear two annual accounts of executors at the same time, the accounts, being separate, should be heard as separate accounts as they were passed upon in the probate court, and be determined by the circuit court substantially in accordance with the same rules governing their settlement in the probate court.

Error to Oakland; Smith, J. Submitted January 7, 1908. (Docket No. 3.) Decided April 1, 1908.

Charles W. Ward appealed from an order of the probate court allowing the third annual account of Willis C. Ward, Franklin B. Ward, and George K. Root, executors of the last will and testament of David Ward, deceased. There was judgment disallowing the account in part, and the executors bring error. Reversed.

*Chamberlain & Guise* (*Elliott G. Stevenson*, of counsel), for appellants.

*John H. Patterson* ( *Watts S. Humphrey* and *H. M. Gillett*, of counsel ), for appellee.

BLAIR, J.   David Ward died May 29, 1900, the possessor of a large estate, including about 70,000 acres of timber lands in the counties of Otsego, Crawford, Antrim, Charlevoix, and Kalkaska, upon which lands there were standing upwards of 300,000,000 feet of pine timber; the timber upon the remaining portion of said lands consisting chiefly of hemlock, maple, beech, basswood, elm, and cherry to a large amount.   Prior to his death Mr. Ward had commenced lumbering operations upon these lands, and, to facilitate the same, had constructed a logging railroad, commencing at Frederic on the Mackinac Division of the Michigan Central Railroad and extending northwesterly through said lands to South Arm upon Pine Lake, an estuary of Lake Michigan.   About three miles of this road at the South Arm ( now East Jordan ) end had been removed by David Ward before his death.

David Ward left a last will and testament, by the provisions of which Willis C. Ward, a son, Franklin B. Ward, a grandson, and George K. Root, a son-in-law, were appointed executors and trustees.   Paragraph 21 of the will reads, in part, as follows:

"All the rest, residue and remainder of my estate of whatsoever kind or character and wheresoever situated, I give, devise and bequeath to my trustees hereinafter named and their successors, in trust, nevertheless, to hold, manage, control, care for, and invest and reinvest the same for the period of twelve years from and after my decease, or until the death after my decease and prior to the expiration of said period of twelve years of two of my children who shall survive me, with the right and option, however, resting in my said trustees, and their successors, to terminate said trust at any time after six years from my decease, in their sound discretion, and during such trust period I direct that my said trustees, and their successors, shall manage, control and administer my said es-

tate, as one entire business and property, and I hereby confer upon them ·and clothe them with all powers and authorities necessary, expedient or desirable therefor, whether of sale, mortgage, leasing, contracting or otherwise, it being my intention to vest them with as ample and absolute powers of disposition, management and control thereof, as I myself exercised over and in respect to the same in my lifetime.

" I direct my said trustees and their successors during said trust period to divide annually among my children who shall survive me, share and share alike, such sum as in their judgment can be so divided and distributed, with due regard to the successful, effective and productive management of the said property and estate so held by them in trust.

" Upon the expiration of said period of twelve years from my decease, or upon the death, prior to the termination of said period, of the second of my said children dying after my decease, or at the option and in the sound discretion of my said trustees, or their successors, at any time after six years from my decease, I direct that the trust created by this twenty-first item of my will shall cease and terminate, and the property, funds, and estate then embraced in said trust shall vest in my children, share and share alike," etc.

The 25th paragraph of the will recommended to the executors and trustees the employment of Robert M. Chamberlain as their principal attorney and legal advisor, who was so employed. Of the six beneficiaries under the 21st paragraph of the will, five are in accord with the trustees and approve of their discharge of the trust. Only the complainant questions the legality, good faith, or beneficial character of the trustees' management of the estate.

Up to about the 1st of January, 1901, the executors and trustees conducted lumbering operations substantially as they had been conducted by David Ward, by cutting the logs in the woods, transporting them over the logging railroad to the Michigan Central Railroad at Frederic, and thence over the Michigan Central to Bay City, where they were manufactured into lumber. About the 1st of January, 1901, the executors. with sufficient others to make up

the required number of stockholders, organized a corporation, under the general railroad laws of the State, under the name and style of the Detroit & Charlevoix Railroad Company, with an authorized capital stock of $525,000, to which corporation the executors transferred said logging railroad with all of its equipment and property. In the fall of 1900 and the early winter of 1901, the executors began the construction of a sawmill plant at Deward, some 11 or 12 miles from Frederic, on the line of the logging railroad, and about 30 miles from East Jordan, without consulting with or obtaining the consent of said Charles W. Ward. On or about the 12th day January, 1901, the said Charles W . Ward, as complainant, filed a bill in the circuit court for the county of Oakland, in chancery, making George K. Root, Willis C. Ward, and Franklin B. Ward, as executors of said estate, defendants therein, alleging, among other things, upon information and belief, that it was the purpose of said executors to extend said railroad from a point near South Arm, Antrim county, Mich., to Charlevoix, Mich., and that, for the purpose of carrying out such plan, the incorporation of the Detroit & Charlevoix Railroad and the vesting of the title thereto and its appurtenances in said corporation was effected. The bill further shows, upon information and belief:

" That said executors are about to purchase and construct a 600-horse power, double-band sawmill near the headwaters of the Manistee river for the purpose of and with the capacity to manufacture 20,000,000 feet of lumber per annum; that one of said executors reports that they do not know what said mill will cost, but your orator states, upon his information and belief, that the same when completed, including fire protection, tramways, houses for men, store, and storage buildings, etc., will cost $250,000."

The bill further alleges :

" That no express authority is granted in said will to. said executors to construct the same and that no intention of testator to that effect can be implied, and that it was not the intention as expressed by said will to authorize

said executors to squander the estate in speculative ventures of that character and the expenditure of such amount as said mill with its accessories will cost is a violation of the trust imposed in said executors, and, if persisted in without the interference of this court, will cause great loss and damage to your orator and the other residuary legatees under said will."

The bill prays that the executors may be perpetually enjoined—

"(b) From expending any money or making any contracts towards the formation and construction, equipment or operation of a railroad extension to Charlevoix, Mich.

"(c) From expending any money or making any contracts for the purchase of machinery and the construction of a sawmill near the headwaters of the Manistee river or elsewhere.

"(d) From committing waste or injury to the property of the estate of David Ward, deceased, and to your orator's interest therein, and from investing or in any manner using the funds or profits of said estate in any speculative enterprise or in any other manner not contemplated by the will of said David Ward. * * *

"(f) That the writ of injunction issue to each of the above-named defendants, their agents and attorneys, enjoining and restraining them and each of them as above prayed during the pendency of this suit or until the further order of this court."

Upon the filing of this bill of complaint, the circuit judge granted a preliminary injunction, restraining the executors from making any contract relating to the construction or equipment or operation of the Detroit & Charlevoix Railroad and the sawmill mentioned in said bill, and any contracts of the said corporation that would bind the estate of David Ward. A further order was at the same time entered, authorizing the complainant to present an application for an enlargement of the scope of the preliminary injunction.

An answer on oath was expressly waived in the bill of complaint. On the 22d day of January, 1901, the defendants filed their sworn answer to the bill of complaint, in which, among other things, it is alleged that prior to

the filing of said bill of complaint they had entered upon the construction of the sawmill, had made contracts for the engines and the bulk of the machinery and equipment of the sawmill and for the superintendence of construction of the same; "and had collected and contracted for timber, brick and other material for use in the construction thereof, and that considerable progress had already been made towards the foundation and framing of the same." They denied that the plant would cost $250,000, "but, on the contrary, aver that the cost of said mill plant and appurtenances when completed will not exceed $100,000, and, from the assurances of the designer and builder of said mill, they confidently hope to complete the same at a cost substantially under the said sum of $100,000." On February 5, 1901, a motion by the defendants for the dissolution of the injunction having come on for hearing upon bill, answer, and affidavits, the following order was made by the court:

"*First.* That the said injunction, as far as it applied or relates to the railroad corporations or railroad properties referred to in the bill of complaint and the injunction issued in the above entitled cause, be, and the same hereby is, dissolved, with leave to said appellant to move for new injunction whenever he shall deem advisable upon satisfactory evidence sustaining the claims made in the bill of complaint.

"*Second.* That the said injunction, so far as it concerns or relates to the building and equipment of the mill plant and appurtenances referred to in the bill of complaint, be modified in manner following, to wit:·

"(*a*) That after the payment, under the terms of the last will and testament of David Ward, deceased, or setting apart by the said defendants of the sum of thirty-six thousand ($36,000) dollars, the amount of the legacies bequeathed to the children of Charles W. Ward by the terms of said will of said David Ward, deceased, and of the payment or setting apart of a sufficient sum by said defendants to pay the claims or debts now allowed by the commissioners on claims in the estate of said David Ward, deceased, the said defendants be allowed to proceed with the construction and completion of the said

152 MICH.—15.

mill, to enter into all contracts necessary therefor, and to expend out of the other funds of the estate (inclusive of all sums already paid out by them or contracts already made by them in connection therewith) the sum of $90,000 in the construction of the mill and for machinery and equipment, and an amount not exceeding $10,000 in the erection of a store, tenement houses, boarding houses, blacksmith shop, barns, offices, dwelling houses, and tramways and other appurtenances to be used in connection with said mill, and not to exceed $5,000 in other improvements and necessary accompaniments of such mill not above enumerated.

"(b) That said defendants be, and they are hereby, enjoined, until the further order of this court, from spending any sum beyond the said sum as above enumerated, aggregating $105,000, in and about the construction, erection and completion of said mill plant, its appurtenances, and incidents."

The court, on deciding the motion for dissolution of the injunction, filed the following minutes of his decision, including, among other provisions, the following:

"I believe that section 21 of the will gives the defendants, as trustees, authority to engage in such a venture, subject only to the authority of a chancery court to restrain them for an abuse of their discretion or for extravagance. Considering the amount of timber owned by the estate, an expenditure of that amount cannot be classed as either extravagant or an abuse of power, with no evidence before the court but ex parte affidavits. * * * The preliminary injunction as to the construction of the sawmill may be modified as follows: The defendants are first to pay or set apart sufficient money to pay the specific legacies provided by the will for the children of complainant; also to pay or set apart sufficient funds to pay the claims already allowed by commissioners against the estate. After this the defendants to be permitted to expend of the other funds of the estate an amount not exceeding $80,000 in the construction of the mill and for machinery. This amount to include expenditures already made, an amount not exceeding $20,000 in the erection of a store, schoolhouse, tenement houses, boarding houses, blacksmith shop, barns, offices, dwelling houses and tramways to be used in connection with the mill, and not exceed $5,000 in other improvements and necessary accom-

paniments of such a mill not above enumerated.   The preliminary injunction to continue, and be enlarged if required, as to the expenditure of any amount in excess of above."

On the 9th day of September, 1901, defendants filed a petition setting forth that they had proceeded with the construction and erection of the mill:

"And in good faith have sought to keep the expenditures in connection therewith within the limit assigned by the injunction of this court as modified by the order hereinabove referred to, but that your petitioners find that up to the present time they have expended upon said mill and machinery the amount of $71,318.46, and upon boarding house, store, houses, and other appurtenances the amount of $8,128.99, and that, as nearly as they can estimate, it will be requisite for them, in order to fully complete the said mill plant and its accessories and to furnish the necessary fire protection therefor, to expend a sum approximating $15,000 in excess of the limit of $105,000 fixed by the terms of said modified injunction.   *   *   *
" Wherefore your petitioners pray that they may be allowed to proceed to the full completion of said mill plant and its accessories, and may be authorized and empowered to expend in connection therewith from the funds of said estate as much as may be necessary to so complete said mill plant and its accessories, not exceeding in the aggregate (inclusive of the sums already expended in that behalf) the amount of $120,000."

On the 30th day of September, 1901, the prayer of the petition was granted and an order entered modifying the injunction so as to permit the executors and trustees—

"To expend in connection with the erection of mill plant, buildings, adjuncts, appurtenances, and accessories an amount not to exceed the sum of $15,000 in addition to the sum of $105,000 heretofore allowed, making a total of $120,000 which the said executors and trustees are hereby authorized to expend for the purposes required as set forth in said petition."

On the 5th day of September, 1902, the parties, through their respective solicitors, stipulated and agreed:

"That the injunction issued in said cause and modified

by said subsequent orders of said court may be further modified, allowing the defendants to expend from the funds of the estate of David Ward a sum not to exceed $15,000 in addition to the amount fixed by the last modification of said injunction * * * in said cause."

On the 30th day of September, 1902, the following order was entered by the court:

"On reading and filing the stipulation of the parties to the above-entitled cause by their respective solicitors consenting to the entry of an order as hereinafter set forth, on motion of Chamberlain & Guise, solicitors for the defendants, and in pursuance of the tenor of said stipulation, it is now ordered, adjudged and decreed by this court that the injunction heretofore issued in said cause, as modified by subsequent orders of this court, be and it is hereby, further so modified as to permit and allow the defendants, as executors and trustees under the last will and testament of David Ward, deceased, to expend from the funds of the estate of David Ward in connection with the mill property, buildings, appurtenances, and accessories referred to in said injunction in said cause and the several orders of this court amendatory thereof, a sum not to exceed fifteen thousand ($15,000) dollars, in addition to the sum of one hundred and twenty thousand ($120,000) dollars fixed by the last modification of said injunction, making a total of one hundred and thirty-five thousand ($135,000) dollars which the said executors and trustees are hereby authorized to so expend."

On the 1st day of October, 1901, the executors filed their first annual account, which was allowed by the probate court November 26, 1901, from which allowance Charles W. Ward claimed an appeal, which was duly allowed on the 15th of January, 1902. In the notice and claim of appeal, the tenth specific reason, which is the only one expressly referring to the sawmill, is as follows:

"Because the disbursements in the construction of sawmill were not itemized, and such disbursements are not classified and properly kept in sawmill construction account."

This appeal was filed in the circuit court on the 1st day of February, 1902. On the 12th day of September, 1904,

upon petition of Charles W. Ward, he was granted leave to file, by way of amendment, additional reasons for appeal, none of which, however, relate to the construction of the sawmill.

The second annual account of the executors and trustees, covering the period from July 1, 1901, to July 1, 1902, was allowed by the probate court on the 23d day of October, 1902. From the allowance of this account no appeal has been taken. The executors' and trustees' third annual account was filed September 23, 1903, covering the period from July 1, 1902, to July 1, 1903. This account was also allowed by the probate court on the 29th day of June, 1904, and claim and notice of appeal regularly taken to the circuit court. The specific reasons for the appeal do not contain any statement that the expense of constructing the sawmill plant had exceeded the sum of $135,000 or any reference whatever to the cost of said plant. The several accounts appealed from, namely, the first and third annual accounts, came on for hearing before the circuit court on May 22, 1905, at which time the chancery case was also pending for hearing. Before entering upon the hearing, the following occurred:

" *The Court:* I am not sure whether the chancery case should precede the hearing upon the allowance of the accounts or not. It depends upon what kind of relief is asked for or expected in the chancery bill. There was an injunction dissolved. How will that affect the chancery case?

"*Mr. Patterson:* I do not think it does, for this reason: The chancery bill asks for an injunction restraining the trustees from continuing the line of railroad, and that question is not raised in any of the pleadings. * * *

"*The Court:* Why wouldn't it be advisable for the chancery case to be disposed of and the hearing of the accounts deferred? * * *

"*Mr. Humphrey:* * * * I can see no difference whether the question is raised in the chancery suit, or whether the question is raised in the objections to the account. I presume likely that it may—that the determination of one would determine the whole. * * * I think the

issue is more clearly and squarely presented under the objections to the first account than in any other way, and I presume likely it would be the simplest way to try it.

"*The Court:* What would be the real need of spending the time of hearing the chancery case at this time, then, if the same questions can be raised in the allowance of the account?

"*Mr. Humphrey:* I was going to make this suggestion for the other side, if it would meet with their ideas. I think all the questions that we care to raise in the chancery case, and all the questions that would be raised to all the other accounts where the appeal has been taken to this court, could be determined in the one account of the first account in this court. I was going to suggest that we take up this first account and have that matter disposed of, and I think it would largely settle the questions at issue in this case. I do not see any necessity for trying more than one case now, do you, Mr. Stevenson?

"*Mr. Stevenson:* We have come here with the understanding that the chancery case would be disposed of. It involves questions that are raised on appeals, and it is the first suit in the court in point of time, and a settlement of these questions in the chancery case would settle necessarily the questions on appeals. The chancery case involves the same accounts that are involved in the several accounts, and it seems to me the most orderly and satisfactory way to dispose of the chancery case, and when that is done the court will make a ruling one way or the other on the question of the power of the trustees to make investments in stocks and the question would be settled finally for all purposes in the chancery case.  *  *  *

"*Mr. Humphrey:* What questions would be settled in the chancery case that would not be settled in this first account?

"*Mr. Stevenson:* There has been a question as to the right and power of the trustees to carry on this business, and the business is continued under a cloud, so to speak. Now, if they do not want to press that feature of it, and if all the questions desired to be raised can be raised on appeals, we offer no objection to the dismissal of the bill in the chancery case. The bill involves a number of vital propositions to the administration of the estate and it seems to me it ought to be disposed of first. It has been in court now a number of years, and we assume, of course, being the first case on the calendar, and involving all the

questions that are in the other case, that it should be disposed of.    \*  \*  \*

"*Mr. Humphrey:* For the purpose of disposing of the matter, I would say that we would consent to the dismissal of the bill without costs and take up the first accounting. We do not seek to raise any questions except the questions that are raised by our appeal. We do not care to embarrass the estate in any way. The proceedings are simply for the protection of the rights between the parties and not for the purpose of embarrassing the estate in the least, and we are willing that the bill should be disposed of in that way and take up the first accounting.

"*Mr. Stevenson:* I am willing to assent to the proposition that the bill be dismissed. The estate ought to have this cloud removed.

"*The Court:* Do you care to waste much time over the question of costs in an estate like this?

"*Mr. Stevenson:* No. The costs are in the discretion of the court, and I take it the court in exercising the discretion would not allow costs.

"*The Court:* If submitted to me, I would be obliged to allow you costs.

"*Mr. Stevenson:* We would not ask it, your honor."

Counsel for the estate called Charles W. Ward as a witness, who gave certain testimony, and thereupon counsel for the estate called Willis C. Ward, who also gave certain testimony, in the course of which the following occurred:

"*Q.* Have you made up a statement as to the cost of the mill?

"*The Court:* I do not expect that to come in until tomorrow morning.

"*Q.* Have you a statement down to any particular date?

"*A.* Yes; down to a particular date.

"*The Court:* Go on until you have a complete statement.

"*Q.* Can it be brought down by tomorrow morning, brought down to date?

"*A.* I think so.

"*The Court:* If the cost of the mill does not exceed \$135,000, there will not be much time spent in taking testimony, because it will be within the order; but, if it runs over, there will be a full cross-examination."

Whereupon, the cross-examination of the witnesses having continued for a time, the following occurred:

"*Mr. Humphrey:* We have been put in possession of some information since last evening of some pending negotiations that may make the result different with regard to some of the items in dispute in this account—some of the largest items. And I think, for the benefit of all concerned, it would be better perhaps that this investigation proceed no further at the present time. It has been suggested by counsel, and I think the suggestion a good one, that the hearing upon all of these accounts be continued, and that the cause be placed upon the calendar for the September term, to be taken up on a day that shall be agreed upon between counsel. By so doing perhaps all difficulties may be obviated, and, with the understanding that we are to have a full opportunity of investigating matters involved in this account, I would be glad to have the case take that course and that the matter stand over until the September term of court."

Thereupon, the further hearing of the account was continued, and the further hearing of the case was resumed June 28, 1906. On the 22d of May, 1905, the following order was entered by the court:

"This cause having been regularly brought on to be heard, on motion of John H. Patterson, solicitor for complainant, the defendants, by their solicitors, Chamberlain & Guise, being present and consenting thereto in open court, it is ordered that the bill of complaint in this cause be and the same is dismissed without costs to either party."

At the conclusion of the proofs, the court made findings of fact and of law. The 28th finding of fact of the court is as follows:

"That after said mill and mill plant had been fully completed, and all expenditures therefor made by the said executors and trustees, and on or about the 22d day of May, 1905, in open court, when said chancery case, in which the said Charles W. Ward was complainant and the said executors and trustees were defendants, came on to be heard (the same day having also been fixed by the court for the hearing on the appeal from the allowance of

the first and third annual accounts filed in the probate court by the executors and trustees of said estate), a statement was produced and exhibited in said court by said trustees showing the total cost of the construction of said sawmill plant and accessories to be about the sum of $132,000, accompanied by a statement of said trustees that such expenditures had not been brought down to date, and that there were a few items making the total amount not exceeding $135,000, which they desired to add to their statement, and that said statements were returned to the trustees for the purpose of having the same brought down to date, and the executors and trustees having stated the cost of the mill and its accessories to be but $135,000, and the accounts themselves as presented to and allowed by the probate court appearing to show the cost of said mill and its accessories to have been but $135,000, and the court having refused to hear the chancery case and the accounts at the same time, the said complainant, in open court, offered to allow the bill of complaint filed in his behalf, as complainant, against the executors and trustees, as defendants, to be dismissed, and, counsel for the executors offering no objections thereto, it was dismissed."

The 30th to the 52d findings of facts, both inclusive, relate to the cost of the construction of the sawmill plant, resulting, as found in the 53d and 54th findings of facts, as follows:

" I find that the cost of said sawmill plant and its accessories were limited by the orders of this court hereinbefore enumerated to the sum of $135,000, and that the cost of said mill plant and accessories, as shown by the items hereinbefore enumerated, amounts to the sum of $189,325.

" I find that said executors and trustees of the estate of David Ward, deceased, have made an unauthorized expenditure of the money and property of said estate in the construction of said sawmill plant and its accessories to the amount of $54,325, in violation of the injunction and orders of the circuit court for the county of Oakland, in chancery."

The 55th finding of facts is to the effect that, although as to findings of facts Nos. 45, 46, 48, and 49, "there is doubt if the order of February 5, 1901, technically, in

terms, covers these expenditures," they are nevertheless found to be within the spirit and meaning of the order of September 30, 1901, and the orders modifying the same.

Findings of facts Nos. 45 and 46 relate to the charge of $8,042.59 for the construction of dock No. 1 at South Arm, which was charged to the Detroit & Charlevoix Railroad Company, and also a charge of $2,963.57 for the Bush Dock at South Arm, which was charged to said railroad company.

Finding of facts No. 48 relates to the construction of a Y at Deward, charged to the Detroit & Charlevoix Railroad Company at the sum of $1,166.76.

Finding of facts No. 49 relates to a charge of $5,721.18 for mill tracks at Deward, which was charged to said railroad company upon its books.

These several items the court found should have been charged to mill construction account and credited on the books of the Detroit & Charlevoix Railroad Company.

The 56th finding of facts is, in part, as follows:

"That, as to the injunction above referred to, there was no determination upon the merits by taking proofs as to whether the will authorized the executors to construct a sawmill, or whether it would be a wise investment, or as to whether $135,000 was a sufficient amount to expend. The injunction was a preliminary one granted upon the presentation of the bill of complaint. The order specified in finding No. 22 was based upon the bill of complaint, the answer of the executors, ex parte affidavits then presented, and the statements of counsel made in open court, more especially the statements of counsel for the executors."

The 57th finding of facts is as follows:

"That in the matter of the injunction limiting the cost of the sawmill and its accessories the executors did not act in good faith, except that they may have acted upon the advice of their counsel. It is found as a fact that they paid no attention to the limitations, except as a matter of form. That they did not materially diminish the amounts they desired to spend, because of the injunctions, but obeyed it in form by asking for its modification and

by distributing various amounts expended therefor among the other accounts than that of 'Mill Construction.'"

In his findings of law the court found that the transactions of the executors and trustees with reference to the incorporation of the railway company and the transfer of the logging railway to it were as to Charles W. Ward wholly null and void.

The 4th and 7th findings of law are as follows:

"(4) That the expenditures of the funds belonging to the estate of David Ward, deceased, by the executors and trustees of said estate in the construction of the mill plant and its accessories in excess of the sum of $135,000, the amount allowed to be by them expended by the orders of the circuit court for the county of Oakland, in chancery, was unauthorized, and that said executors and trustees should receive no credit therefor, either upon their annual or final accounts.

"(7) I further find as a matter of law that the said trustees should be charged with the sum of fifty-four thousand three hundred and twenty-five ($54,325) dollars, being the amount of money expended by said trustees in the construction of said mill, and the appurtenances and accessories, in excess of the $135,000, the amount allowed by the orders of the circuit court for the county of Oakland, in chancery, and that said sum of money be credited by said executors and trustees to mill construction account, said amount to be charged against said executors and trustees to be hereafter accounted for by them in their annual or final accounts as money in their hands belonging to said trust estate, but, four of the residuary legatees having in open court asked to have the account allowed as to them, said account is allowed except as to $18,108.33 unlawfully expended belonging by the will to Charles W. Ward and Willis C. Ward in equal shares."

From the judgment of the circuit court entered upon his findings of facts and law, the executors have appealed to this court, assigning numerous errors. The fundamental errors which appellants contend underlie the proceedings of the court below are: That the court perverted the hearing of the accounts into proceedings to determine whether appellants were punishable as for contempt of

court in violating the temporary injunction issued therein; that the court failed to give due legal force and effect to the absolute dismissal, prior to the hearing in the court below, of the bill of complaint in the chancery suit; that the court refused to give to the allowance of the executors' and trustees' second annual account the force and effect legally due thereto; that there was no allegation among the reasons assigned by the said Charles W. Ward for his appeal from the order of the probate court allowing the trustees' third annual account that the trustees' expenditures in connection with the sawmill and its accessories had exceeded the limit fixed by the injunction nor that such expenditures were unreasonable, extravagant, or prejudicial to the trust estate or those beneficially entitled thereto, and therefore such facts could not lawfully form the basis of the court's judgment.

Since the judgment the railroad property has been sold to the Michigan Central Railroad Company and the proceeds of the sale distributed among the beneficiaries. As to all items in the accounts relating to the railroad, it is agreed that the order of the probate court shall be affirmed, leaving for our consideration only such items as relate to the construction of the sawmill plant.

The effect of the dismissal of the bill of complaint in the chancery suit: It is contended on the part of the executors that the effect of the decree dismissing the chancery suit was to adjudicate all of the issues involved in the pleadings, and that the questions so determined could not be considered in the hearing of the probate appeals. In the absence of any evidence to the contrary, this contention would probably be correct, since the court would presume that the voluntary dismissal of the suit at the hearing was on the merits.

"To operate as a bar to a subsequent suit, however, the dismission must have been upon the merits, or, if voluntarily, after proofs taken, and the cause in readiness for hearing." *Edgar* v. *Buck*, 65 Mich. 356.

The fact that no proofs were taken might not affect the

result in a case like this, involving the construction of a will; but the dismissal must be upon the merits, presumptively at least. In this case the circumstances surrounding the dismissal and the colloquy between court and counsel disclose that the decree of dismissal was not upon the merits. The chancery suit and the probate appeals were alike pending for hearing. The question was presented: Which should be heard first? It was the view of court and counsel that a determination of either suit would determine all of the questions involved and the chancery suit was dismissed by mutual consent, with the implied understanding that such dismissal would not affect the hearing and determination of the question involved in the probate appeals. The suit was dismissed, in effect, because there was an adequate remedy at law. The chancery suit could only be dismissed by consent. By the consent order the defendants had acquired rights of which they could not be deprived without their consent. *Weber* v. *Costigan*, 139 Mich. 146; *Seymour* v. *Jerome*, Walk. Ch. (Mich.) 356; *Wyatt* v. *Sweet*, 48 Mich. 539; *Chicago, etc., R. Co.* v. *Rolling Mill Co.*, 109 U. S. 702.

By consenting to the dismissal of the bill, they surrendered the rights which they had acquired under their interlocutory decree, and, on the other hand, the complainant surrendered any rights he may have acquired under the injunction and injunction orders. All of the incidents of the bill fell with it upon its unqualified dismissal by mutual consent, and the parties, so far as that particular suit was concerned, were left in the position they would have occupied if the suit had not been instituted. *Coleman* v. *Bridge Co.*, 5 Blatchf. (U. S.) 56; *Dowling* v. *Polack*, 18 Cal. 625; *Brevoort* v. *City of Detroit*, 24 Mich. 322; *Hope* v. *Acker*, 7 Abb. Prac. (N. Y.) 308; *Amberg* v. *Kramer*, 8 N. Y. Supp. 821; 22 Cyc. p. 981, par. 4; *Moat* v. *Holbein*, 2 Edw. Ch. (N. Y.) 188; *Peck* v. *Yorks*, 32 How. Prac. (N. Y.) 408.

It follows that the court erred in trying this case upon the theory, which he apparently adopted as a matter of

law, that the amount allowed for construction by the consent order in the chancery case was conclusive of the question on the probate appeals.

The case of *Smith* v. *Smith*, 52 Mich. 538, is not opposed to this ruling. In that case the wife had filed her bill of complaint for a divorce against the husband. An injunction was issued restraining the husband from interfering with the wife's possession of certain household goods. While the divorce was pending the husband demanded possession of certain of these household goods, and, his demand being refused, brought replevin for them. The divorce suit was still pending and the injunction in force when the replevin suit was tried, and it is clear that the husband could found no rights upon a demand made under such circumstances. In the present case the rights of appellee do not depend upon the orders modifying the injunction, but upon the will of David Ward. The decree dismissing the chancery suit vacated the orders made therein and deprived the court of authority to punish as for contempt any acts in opposition to such orders. By a parity of reasoning, acts which the court could not punish as unlawful because the foundation of such authority had been destroyed could not be conclusively held unlawful in an entirely distinct suit in another court.

Appellee, however, has not maintained the position of denying the right of the executors to build and equip a sawmill. On the contrary, upon their advising him that $120,000 was insufficient to complete the mill, he by the stipulation of September 5, 1902, consented, and, as it was his money, he, in effect, directed the executors to take and expend an additional $15,000 for that purpose. It is true that proof of his conduct is made by the stipulation, and the order based thereon, in the suit which has been dismissed. It could have been otherwise proven, since appellee himself would have so testified. It is not a controverted fact. In my judgment appellee should not be permitted to deny or to question the proper effect of this action. Its effect in this proceeding is precisely the effect

the same action would have if no suit had been pending—
no greater, no less. Assuming that the action was not
procured by fraud or concealment, it is conclusive evi-
dence of acquiescence in the conduct of the executors in
engaging in the business of manufacturing lumber and in
expending the sum mentioned to build and equip the mill.
That is to say, if the mill was now in operation, and if
the accounts rendered showed an honest expenditure in
that behalf of $135,000, then appellee would be estopped
to contest the allowance of the account.

If the court's finding of facts No. 28 is open to the con-
struction that it determines that the bill of complaint was
dismissed because the executors produced an account
showing that they had only expended the $135,000 per-
mitted by the orders, the record does not sustain the find-
ing; but, on the contrary, disproves it. The certificate of
the circuit judge alleges that the bill of exceptions "con-
tains all of the testimony introduced, and proceedings had
upon the trial." This is not a case admitting of the pre-
sumption that the finding states the facts correctly, since
the record shows what actually took place and negatives
such presumption. No estoppel, therefore, can be based
upon such alleged position taken by the executors, and
cases like *Tomlinson* v. *Cornett*, 128 Mich. 171, do not
apply.

Was the question of the extravagance, excessiveness,
unreasonableness or bad faith of the expenditures of the
executors in the construction of the mill properly before
the court on the probate appeals? We find nothing in
either appeal to raise such question. The statute regulat-
ing appeals from the probate court requires the appellant
to state the reasons for his appeal, and the appellate court
is limited to the determination of the questions so pre-
sented. 1 Comp. Laws, §§ 669, 671, 673, 679; *In re
Beers*, 148 Mich. 300; *Jersey* v. *Jersey*, 146 Mich. 660;
*Holbrook* v. *Cook*, 5 Mich. 229; *Mower's Appeal*, 48
Mich. 441; *Simmons* v. *Goodell*, 63 N. H. 458; *In re
Davis' Estate*, 149 N. Y. 539. This objection, however,

does not seem to have been made at the hearing and is inconsistent with the understanding of the parties that the whole subject should be disposed of on the probate appeals, in accordance with which the testimony appears to have been put in.

· The effect of the second annual account: Counsel for the executors contend:

" The first debit item in the second annual account was the balance as shown by the trustees' first annual account and as allowed by the probate court, and the balance of the second annual account as adjudicated and determined by the decree of the probate court, unless modified on appeal, became conclusively fixed and established as the debit item with which the trustees' third annual account must start."

The balance found on the first annual account was appealed from, and it was not necessary or proper to appeal from this same balance a second time. The second annual account involved only the new items not included in the first account and the adjudication thereon only affected such items. The order allowing the second account was conclusive as to the additional items included therein, provided there was no fraud, omission of credit, or concealment of the true state of the account, in which event the finding could be challenged upon a subsequent accounting. *Morton* v. *Johnston*, 124 Mich. 561; *Porter* v. *Long*, 124 Mich. 584.

Certain charges to mill construction: We are of the opinion that executors may properly charge an item to either one of two accounts, where they might lawfully determine in the first instance to make the expenditure out of either of said accounts, and that such items as those covered by findings Nos. 45, 46, 48, and 49 were legitimately charged to the railroad account.

Method of hearing the account: Although it was proper to hear the two accounts at the same time and take testimony as to both, still the accounts were separate and were to be passed upon as separate accounts, as they were

passed upon in the probate court, and to be determined by the circuit court substantially in accordance with the same rules of law governing their settlement in the probate court. *Casserly* v. *Casserly*, 123 Mich. 44. It is apparent that the circuit court did not pass upon the items of the accounts at all, for the purpose of considering in the usual way whether they should be allowed or disallowed, but confined the inquiry to the question whether the executors had spent more money than the orders of the chancery court permitted them to spend in constructing the mill, and held them responsible for the excess, regardless of the reasonableness, beneficial character, or good faith of the expenditures, or the fact that the property purchased is in existence, the lumber constituting the largest item objected to, of considerable value, and belonging to the legatees.

Judgment reversed, and new trial granted, with costs of both courts to appellants.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.